**Date Signed:
February 27, 2015**



SO ORDERED.

Robert J. Faris
United States Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| In re ADAM LEE,<br><br>      Debtor. | Case No. 13-1359<br>Chapter 7 |
| DANE FIELD,<br><br>      Plaintiff,<br><br>vs.<br><br>ADAM and YUKA LEE,<br><br>      Defendants. | Adv. Pro. No. 14-90003<br><br><br><br><br>Re: Docket No. 1 |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this adversary proceeding, the bankruptcy trustee of debtor Adam Lee seeks to avoid the transfer of two properties from Mr. Lee to Mr. Lee and his wife, as tenants by the entireties. The trial was held on February 2-4, 2015. At trial, Enver Painter represented the trustee, and Lars Peterson represented Mr. and Mrs. Lee.

Based on the evidence, I make the following

# FINDINGS OF FACT

1. Adam Lee is an experienced and sophisticated real estate investor who was successful for many years. He entered the real estate business in about 2003. He began by starting a service that provided photographs of properties listed in the Multiple Listing Service and by acting as a real estate agent. He soon began investing in property for his own account as a "house flipper": he purchased properties, mostly single family residences in the leeward districts of Oahu, and resold them as soon as possible, hoping for a quick profit.

2. The house flipping business was successful and profitable. But by about 2006, Mr. Lee decided that single family home prices had risen to the point that there were few if any opportunities for successful house flipping. He decided to shift his investment strategy. He sold his inventory of single family homes and began to buy small rental apartment buildings, convert the rental units to modestly priced condominium units, and sell the individual units. He testified that converting the buildings to condominiums increased their value by about 50%.

3. His first forays into the condominium conversion business were successful and profitable.

4. In 2007, Mr. Lee (through companies he controlled) acquired three apartment buildings, located at 1402 Piikoi Street, 805 Kinau Street, and 1510 Liholiho Street, which later caused problems for him. Central Pacific Bank ("CPB")

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed 02/27/15   Page 2 of 18

financed the 805 Kinau project with a $3.315 million loan and the 1510 Liholiho project with a $3.791 million loan.

5. In the fall of 2008, the United States – indeed, most of the world – entered the worst economic downturn since the Great Depression of the 1930's. A crisis in the financial services industry precipitated the downturn, so lending became particularly tight. The general economic decline coupled with constrained loan markets had a dramatic negative effect on real estate markets. The sector in which Mr. Lee was active – moderately priced residential condominiums – was hit less hard than other portions of the real estate market, but the effects were striking nonetheless.

6. By 2010, Mr. Lee faced serious financial challenges.

    a. <u>The 1402 Piikoi project</u>.

        i. On July 22, 2009, the City and County of Honolulu issued a "stop work" order based on Mr. Lee's failure to obtain required building permits and to use appropriately licensed contractors for the renovation work. On October 2, 2009, the City began imposing a fine of $1,000 per day until the violations were corrected. On August 1, 2011, the City filed a notice of a lien for the civil fines, which by then amounted to $701,000. The corrective work has never been completed and the fines have never been discharged.

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed  02/27/15   Page 3 of 18

      ii.     On April 26, 2010, a group of people who had purchased units in the 1402 Piikoi Street project sued Mr. Lee and his company. The complaint alleges that the defendants had violated Hawaii's condominium statutes, committed fraud, and engaged in unfair and deceptive trade practices and acts. The plaintiffs sought rescission of their purchase contracts and compensatory, treble, and punitive damages. At about the same time, some of the owners submitted complaints to the State of Hawaii Regulated Industries Complaints Office.[1] Other unit owners have made similar claims. None of the unit owners' claims (with one possible exception) have been resolved to date.

    b.    <u>The 805 Kinau project</u>.

      i.     Due to the bad economy, CPB's financial condition deteriorated, and its regulators pressured it to reduce its portfolio of troubled loans.[2] Thus, CPB became more aggressive in enforcing its legal rights and less willing to roll over loans as they matured.

      ii.    CPB's loan on the 805 Kinau project matured on July 12, 2010. Just two days later, on July 14, 2010, CPB sued Mr. Lee to collect the loan and foreclose the mortgage. The court later appointed a

---

[1] Ex. 8 at 13.

[2] Ex. 2025 at 4.

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed 02/27/15   Page 4 of 18

receiver of the property and entered a decree of foreclosure.

       iii.     In October 2010, CPB agreed to accept $2.7 million in cash in full satisfaction of the 805 Kinau loan. CPB accepted this amount because CPB thought that was about as much as CPB would get if it foreclosed on and resold the property and that "the collection of a full deficiency from [Mr. Lee] is doubtful" because he had "serious financial difficulties" and had "engaged new counsel whose primary speciality is bankruptcy."[3]

       iv.     Mr. Lee paid off the discounted amount of the CPB loan for 805 Kinau using funds he borrowed from an individual investor. He later repaid the new loan with the proceeds of sale of units in the building.

    c.     <u>The 1510 Liholiho project</u>.

       i.     CPB's loan on the 1510 Liholiho project matured in January 2010, and CPB and Mr. Lee could not agree on the terms of an extension. At that time, the loan balance was about $3.9 million. In April 2010, CPB accepted about $3 million in full satisfaction of the loan. Mr. Lee borrowed the necessary funds from the same person who lent him

---

[3] Ex. 10 at 15.

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed  02/27/15   Page 5 of 18

the payoff money for 805 Kinau.[4] He later repaid the new loan with the proceeds of sale of units in the building.

    d.    <u>Tax Issues</u>.

        i.    On August 16, 2010, the State of Hawaii notified Mr. Lee that his tax returns for 2005 through 2008 had been selected for audit.

        ii.    The audit was not completed until September 3, 2013. Repeatedly noting that Mr. Lee failed to provide information and documents requested, the auditor assessed additional taxes of over $1.6 million. Mr. Lee has not filed any tax returns for 2010 or subsequent years.

7.    During 2010, Mr. Lee decided that he needed to change his business strategy again.

    a.    His residential condominium conversion business depended on generous financing terms. Unless he could borrow almost all of the money to acquire and renovate buildings, including an interest reserve to cover interest accruals during the renovation and sale period, he could not earn an adequate

---

[4] The new loan bore interest at 10.5% per annum. But because only a portion of the loan proceeds were actually disbursed to the borrower at the loan closing, the promissory note acknowledges that the "imputed cash on cash interest rate on Lender's disbursements at closing" was 11.73% per annum. Ex. 2020 at 3. These rates were far higher than the rate charged by CPB on the existing loan (4.5%, ex. 2100 at 6) and the market rate for thirty year fixed rate mortgage loans at the time (according to ex. 2119, 5.1%). This high interest rate is inconsistent with Mr. Lee's claim that he was in good financial condition.

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed  02/27/15   Page 6 of 18

return. In the constrained financial market of 2010, such financing was unavailable.

b. He therefore decided to shift from residential to commercial property, despite the fact that he had no experience in the commercial property market.[5]

c. On July 24, 2010, Mr. Lee (through a limited liability company that he controlled) entered into a contract to purchase a commercial building at 2130 Beretania Street for $1.45 million.[6] The transaction closed on October 29, 2010.[7]

d. Mr. Lee hoped to flip the property quickly, or to convert it to an office condominium, but neither of those prospects materialized. He was also unable to find tenants for the building. He eventually sold the project at a loss.

8. In late September 2010, Mr. Lee met with and retained Chuck Choi, of

---

[5] Mr. Lee acquired a residential apartment building on the island of Lanai during July 2011 for $1.2 million (ex. 2108). He borrowed the purchase money from the same lender who refinanced the CPB loans on the Kinau and Liholiho projects. The interest rate on the loan was high (at least 8%). Ex. 2114. Mr. Lee testified at trial that he underestimated how difficult it would be for him to properly manage that property. He sold the property in 2012 for $1.495 million, but the purchase price is apparently payable only when the buyer resells the property or the individual apartment units (ex. 2110 at 4), so it is unclear whether that investment will be successful.

[6] Ex. 2002, 2013.

[7] Ex. 2013. The same lender that refinanced the CPB loans on the Kinau and Liholiho projects also financed Mr. Lee's acquisition of the Beretania property. The interest rate on the loan was 8%, a high rate at the time, and subject to *increase* if certain conditions were not met. Ex. 2112.

7

Wagner Choi & Verbrugge. Mr. Choi is an experienced attorney whose practice emphasizes bankruptcy, insolvency, and debtor-creditor relations. Mr. Lee's written agreement stated that he was retaining the firm "to provide [Mr. Lee] with advice, consultation, and representation regarding the [creditor workout] and bankruptcy-related issues which may become a factor in the above proceeding and any subsequent bankruptcy filing that affects [Mr. Lee's] interest related to the above proceeding."[8] Mr. Lee gave Mr. Choi copies of certain correspondence with CPB, the letter stating that his tax returns had been selected for audit, and documents relating to the fines and buyer claims on the 1402 Piikoi project.[9]

9. On October 1, 2010, within days after his meeting with Mr. Choi, and based on what he understood to be Mr. Choi's advice, Mr. Lee transferred his interest in two condominium units on Palua Place in Honolulu to himself and his wife, as tenants by the entireties.[10] Mr. Lee and his wife lived in one of the two units.

10. The trustee proved, by clear and convincing evidence, that Mr. Lee transferred his interest in the Palua Place properties to himself and his wife with actual intent to hinder, delay, or defraud his existing and future creditors.

11. Although Mr. Lee has altered his sworn statements as the case

---

[8] Ex. 8 at 28.

[9] Ex. 8.

[10] Ex. 1, 2.

8

progressed in an attempt to protect his interests, his own testimony establishes his fraudulent intent.

      a.      At the first meeting of creditors, Mr. Lee testified that he met with Mr. Choi to discuss a possible bankruptcy filing, that they discussed "exemption planning," and that he "followed through with what we discussed" when he transferred the Palua properties.[11]

      b.      Later, in a deposition, Mr. Lee testified that Mr. Choi told him "to convey my properties because I was in a high-risk business, high profit. But, you know, in the future, if anything went wrong and if any future creditors or any problems arise in the future, then it would be smart to have my personal residence in T-by-E."[12] This is an admission that he transferred the property to himself and his wife in order to hinder, delay, or defraud *future* creditors. And the suggestion that he did not also intend to hinder, delay, or defraud *existing* creditors is not credible.

      c.      In a declaration filed in opposition to the trustee's motion for summary judgment, Mr. Lee testified that Mr. Choi "advised [him] to transfer the Properties to tenancy by entirety with the goal of protecting [his] family

---

[11] Ex. 4 at 5-7.

[12] Dep. of Adam Lee 183 (Dec. 4, 2014).

9

from future risks associated with my real estate transactions"[13] and "so that the Properties might be protected in the future if I should ever fall on hard times."[14] This is an admission that Mr. Lee intended to keep the Palua properties out of the reach of (at least) his future creditors.

    d.    At trial, Mr. Lee's testimony continued to evolve. He admitted that, when he met with Mr. Choi, he "was also concerned about the potential risks of the high-value transactions [he] continued to be engaged in and wanted advice regarding how to protect all my assets, including my personal residence."[15]

    e.    The first version of Mr. Lee's story, given before he had a chance to tailor his story to suit his interests in this adversary proceeding, is the most credible; he put the property in tenancy by the entireties to keep it away from his creditors. Even the "tailored" versions of his testimony do not save him, because he admitted that he wanted to keep the property away from his *future* creditors.

12.    At trial, Mr. Lee testified that he believed that tenancy by the entireties property is not protected from creditor claims. This is not correct; under Hawaii law,

---

[13] Dkt. 49-1 at 3.

[14] *Id.* at 4.

[15] Decl. of Adam Lee at 3 ¶ 5.

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed 02/27/15   Page 10 of 18

entireties property is completely protected from the creditors of each spouse and is subject only to joint claims.[16] I do not believe Mr. Lee's testimony. It is simply inconceivable that an experienced real estate professional in Hawaii would not know about the key attribute of entireties property. Moreover, this testimony cannot be squared with his declaration testimony that he transferred the property into tenancy by the entireties "so that the Properties might be protected in the future if I should ever fall on hard times."[17] He knew about the protections of the tenancy by the entireties and intended to use them.

13. The financial difficulties that Mr. Lee faced at the time of the transfer are powerful circumstantial evidence of his fraudulent intent.

    a. At the time of the transfer, Mr. Lee faced a foreclosure suit on one of his projects, multiple suits and claims by disgruntled unit buyers, sizable penalties from the City, and a tax audit which ultimately resulted in a large assessment. His primary lender, CPB, refused to extend the maturity of his existing loans on terms he found acceptable. His situation was so bad that he consulted with an expert bankruptcy lawyer.

        i. Mr. Lee testified at trial that he met with Mr. Choi, not to discuss a possible bankruptcy filing, but rather to discuss certain

---

[16] *Sawada v. Endo*, 57 Haw. 608 (1977).

[17] Dkt. 49-1 at 4.

11

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed 02/27/15   Page 11 of 18

bankruptcy-related provisions of loan documents with which he was unfamiliar. This is not believable. Mr. Lee gave Mr. Choi documents that covered a wide range of financial problems; the loan documents were not even in Mr. Choi's file.[18] Further, Mr. Lee never identified which provisions, or even which documents, gave him pause, and the loan documents admitted in evidence[19] contain no unusual provisions about bankruptcy.

    ii.    His written retainer agreement with Mr. Choi's firm does not mention a review of loan documents and specifically includes bankruptcy matters within its scope.

    iii.    At the first meeting of creditors, Mr. Choi stated on the record that, "I met with him in September of 2010 to discuss, among other things, a potential bankruptcy and exemptions."[20] At the same meeting of creditors, Mr. Lee testified under oath that, "I retained Chuck, and then we discussed, you know, just – I was considering a bankruptcy basically."[21] Later in the same meeting, he testified that, "I

---

[18] Ex. 8.

[19] *E.g.*, ex. 2004, 2015, 2016, 2020, 2122, 2123, 2124, 2128.

[20] Ex. 4 at 4.

[21] *Id.* at 5.

12

saw Chuck, you know, specifically, about bankruptcy."[22] His earlier statements, made before he had a chance to tailor his story to protect his interests, are believable; his statements at trial were false.

b. The economy was in the throes of the worst economic crisis in decades. The real estate market was in shambles.

c. Mr. Lee had already decided that his existing business model – residential condominium conversions – did not work any more because he could not obtain financing on the terms he needed. Accordingly, he had decided to shift into the commercial real estate sector, in which he had no experience and which turned out badly.

d. Mr. Lee testified at trial that, in October 2010, his financial condition was good. This testimony is not believable, considering the objective reality of his situation and the horrible condition of the real estate market at that time.

e. Mr. Lee testified that, at the time of the transfer, his net worth was about $3.9 million. But by the time he filed his bankruptcy petition on August 12, 2013, his net worth was negative.[23] His attempt to explain the loss

---

[22] *Id.* at 7.

[23] At trial, he testified that his bankruptcy schedules overstated some of his liabilities. He did not claim, however, that he was solvent on the date of bankruptcy.

13

U.S. Bankruptcy Court - Hawaii    #14-90003    Dkt # 301    Filed 02/27/15    Page 13 of 18

of net worth is unpersuasive; in truth, he did not have a net worth of $3.9 million in October 2010.

      i.      He attributed the loss of net worth partly to the 2130 Beretania property. But that explains only a small part of the loss. He testified that he paid about $8,000 per month for mortgages and other expenses while he owned it from November 2010 until September 2012, a period of twenty-two months. This yields a total outlay of $176,000. He also testified that he sold the property for $1.325 million, which was $125,000 less than he paid for it. Thus, his total loss on the Beretania property was only a little more than $300,000.

      ii.      According to Mr. Lee, his two most valuable assets in October 2010 were his interests in the 805 Kinau and 1510 Liholiho projects.[24] His financial statements say that those assets (less encumbrances) were worth about $2.9 and $1.8 million, respectively. In his deposition, Mr. Lee testified that those two projects "underperformed," by which he must have meant that they did not produce the expected net profits. This is another way of saying that the projects were not worth as much as the financial statements indicated. Therefore, the financial statements are unreliable.

---

[24] Ex. 2019, 2085.

14

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed 02/27/15   Page 14 of 18

f. At the time of the transfer, Mr. Lee was paying many of his debts. He made substantial payments on credit card debt and was apparently on good terms with many if not all of his individual investors. But Mr. Lee must have known – a person as intelligent as Mr. Lee surely would have known – that his finances were precarious at best.

14. The following facts are also convincing circumstantial evidence of his fraudulent intent: (a) the transfer was to "insiders," Mr. Lee himself and his wife; (b) Mr. Lee continued to live in, and retained possession and control of, the properties after the transfer; (c) Mr. Lee was sued before the transfer; (d) Mr. Lee received nothing in return for the transfer; and (e) Mr. Lee transferred the property about the same time as he incurred the refinancing loans and the sizable new loan for the Beretania property.[25]

15. The fact that the value of the transferred asset represented a relatively small part of Mr. Lee's total assets weighs against a finding of fraudulent intent. But the weight of this fact is minimal because the transferred asset included Mr. Lee's home, an asset that has value to its owner beyond its economic worth. People regularly take economically irrational actions to protect their homes; people are more inclined to take improper actions to protect their homes than to protect other assets.

16. The trustee did not prove that, at the time of the transfer, Mr. Lee

---

[25] *See* Haw. Rev. Stat. § 651C-4(b).

U.S. Bankruptcy Court - Hawaii    #14-90003    Dkt # 301    Filed 02/27/15    Page 15 of 18

(a) was engaged or was about to engage in a business or a transaction for which his remaining assets were unreasonably small in relation to the business or transaction, (b) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due, or (c) was insolvent or became insolvent as a result of the transfer.

Based on these findings of fact, I draw the following

## CONCLUSIONS OF LAW

1.      The bankruptcy court has subject matter and personal jurisdiction and has constitutional power to enter a final judgment. Venue is proper in this district.

2.      A trustee in bankruptcy "may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable . . . ."[26]

3.      Under Hawaii law, "[a] transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor . . . ."[27] Such a transfer is subject to avoidance.[28]

---

[26] 11 U.S.C. § 544(b).

[27] Haw. Rev. Stat. § 651C-4(a)(1).

[28] *Id.* § 651C-7(a)(1).

16

4.   I have found that Mr. Lee transferred the Palua properties to himself and his wife, as tenants by the entireties, with the actual intent to hinder, delay, or defraud his existing and future creditors. The transfer is therefore subject to avoidance.

5.   The recipient of a transfer made with actual intent to hinder, delay, or defraud a creditor has a defense if the transferee proves that the transferee took the transfer in good faith and for a reasonably equivalent value.[29] This is an affirmative defense; the transferee bears the burden of establishing both of these elements.[30] I have entered summary judgment in favor of the trustee on this defense, on the ground that Mrs. Lee gave no value in exchange for the transfer.

6.   The trustee's complaint alleged that the transfer was "constructively fraudulent" under sections 651C-4(a)(2). That subsection requires the trustee to prove that Mr. Lee made the transfer:

> Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> > (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> >
> > (B) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's

---

[29] Haw. Rev. Stat. § 651-8(a).

[30] Haw. Rev.Stat. § 651C-8(a); *Hayes v. Palm Seedlings Partners-A (In re Agricultural Research and Technology Group, Inc.),* 916 F.2d 528, 535 (9th Cir. 1990).

17

U.S. Bankruptcy Court - Hawaii   #14-90003   Dkt # 301   Filed 02/27/15   Page 17 of 18

ability to pay as they became due.

7. I have granted summary judgment in favor of the trustee on the question whether Mr. Lee received reasonably equivalent value in exchange for the transfer. The trustee did not, however, prove the other elements of this subsection.

8. The trustee's complaint also relies on section 651C-5(a), which provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation.

9. Although the trustee proved that Mr. Lee was in serious financial distress at the time of the transfer, he did not prove that Mr. Lee was insolvent at that time or that the transfer left Mr. Lee insolvent.

## JUDGMENT

The trustee's counsel shall submit a proposed judgment avoiding the transfer of the Palua properties from Mr. Lee to himself and his wife.

**END OF FINDINGS AND CONCLUSIONS**